IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

DELORIS BURKETT,

    Plaintiff,

v.                                                        CASE NO. 1:03-cv-00103-MP-AK

ALACHUA COUNTY, et al.,

    Defendants.

_____/

**O R D E R**

This matter is before the court on Doc. 74, Defendants' motion for summary judgment. Plaintiff has filed a response in opposition to Defendants' motion, Doc. 78. After considering the filings put forth by the parties, this court hereby grants summary judgment for the Defendants.

I. STATEMENT OF FACTS

This case involves a series of events that began in desperation and ended in tragedy.

At approximately 3:45 a.m. on the morning of June 13, 2001, Gainesville police officers Mike Shentrup ("Shentrup"), Dontonya Smith ("Smith), and Guillermo Romos ("Romos") responded to a call from Alachua County resident Deloris Burkett. Deloris Burkett had contacted the Gainesville Police Department for assistance in transporting her eighteen year-old son, Mark Burkett ("Burkett"), to Meridian Behavioral Health Unit ("Meridian"), a crisis stabilization unit located in Gainesville, Florida. Doc. 78-1 at 1-2. Deloris Burkett had notified the officers that Burkett had been acting strangely all day, and that he was "alternatively irritable, restless and non communicative [sic]." Doc. 78-1 at 1. She requested that the officers take her son to Meridian for immediate psychiatric evaluation.

When the officers arrived, Burkett seemed laconic and disinterested. Burkett –who was 6'2" tall and weighed 245 pounds–did not resist the officers' initial attempts to move him to a patrol vehicle for transportation. Accompanied by Burkett's father, Bennie Burkett, the officers escorted Burkett towards their patrol vehicle. On the cusp of entering the vehicle, Burkett began to resist the officers' efforts. Responding to Burkett's resistance, the officers attempted to forcibly place Burkett in the back seat of the patrol car, at which time Burkett's resistance dramatically increased. Grabbing his father by the shirt, Burkett refused to enter the vehicle. Instead, tugging his father nearer, Burkett reared back and intentionally head-butted his father. Doc. 78-2 at 3. Recognizing Burkett's increasing violence, the officers struggled to control him, ultimately pinning Burkett to the ground. Although Burkett was largely immobilized, he still had a limited range of movement. Pinned beneath the officers, Burkett put Ramos' left hand into his mouth and bit Ramos' thumb, ultimately resulting in severe lacerations with muscle and nerve damage. Burkett also attempted to pull Shentrup's face near his own, ostensibly to bite Shentrup as he had Ramos. Id. Although Burkett was unable to get a firm hold of Shentrup, Shentrup nonetheless suffered multiple lacerations and scratches. Ultimately, more officers arrived at the scene to assist in restraining Burkett. Once Burkett was handcuffed and restrained, Officer Smith brought him to Alachua County Jail, where Burkett was charged with domestic battery and multiple counts of aggravated assault to a police officer.

Upon arriving at the County Jail around 4 A.M., Burkett was booked and placed in a single person cell which measured approximately eight feet long by four feet deep. Defendants allege that from roughly the time of his arrival until 8 A.M., Burkett could be heard hammering on his cell door, shouting and screaming obscenities. For example, when Correctional

Supervisor Corey Warren arrived to work around 6 A.M., he claims to have heard Burkett screaming, "Come on in here. You're gonna be my next victim." Doc. 74-4 at 2. At 8 A.M., officers arrived to prepare Burkett for his First Appearance before a judge. At the time the officers arrived, Burkett was "seated and quiet," although "unresponsive to commands to lay on the floor with his hands behind his back." Doc. 74-4 at 5-7. The officers claim that, because of the earlier violent altercation with Burkett, they ordered Burkett to lay on his stomach on the floor. Burkett was allegedly non-responsive and gave no indication that he heard or processed the officers' orders. Id. Several officers rushed into Burkett's cell to subdue him, using a taser gun on Burkett in the process. Once Burkett was secured, the officers handcuffed and shackled him for his appearance before the judge, taking time to bandage the wounds inflicted by the taser gun. Officers then transported Burkett to a nearby area where video First Appearances were normally conducted.

During the First Appearance before Judge Phyllis Kotey, Burkett continued to act strangely. In response, Judge Kotey ordered a mental health evaluation. Moreover, in response to the altercation at Burkett's home, Judge Kotey ordered that a sample of Burkett's blood be taken; she feared that Burkett, if infected with HIV, could have transmitted the virus to Officers Ramos and Shentrup. Doc. 74-12 at 5. Judge Kotey, however, indicated no fixed time frame for the drawing of blood. Burkett did not resist the officers upon return to his cell. Although Judge Kotey ordered a mental health evaluation, the officers of the County Jail did not identify Burkett as a mentally ill inmate, nor were there any procedures at the Jail to do so.[1]

---

[1] Plaintiff alleges that it was "[t]he practice of the Alachua County Jail to exhibit conscious indifference to the needs of the mentally ill." Doc. 78-1 at 3. Such conduct, Plaintiff contends, contributed to Burkett's eventual death.

*Case No: 1:03-cv-00103-MP-AK*

At 12:30 P.M., officers, accompanied by a nurse, entered Burkett's cell.  The nurse, with the help of the officers, injected Burkett with a sedative cocktail containing a mixture of Ativan, Haldol, and Benadryl.  Burkett responded to the cocktail and showed no signs of aggression.  Doc. 74-12 at 3.  There were no further incidents involving Burkett until approximately 3:00 p.m., at which time officers again entered Burkett's cell, this time to draw blood from Burkett.

When the officers arrived, Burkett was still handcuffed and shackled as he had been prior to his First Appearance.  Lieutenant Donovan states that Burkett rushed the officers when they entered Burkett's cell.  Id. at 8.  It is undisputed that at least four officers wrestled Burkett to the ground, where they pinned his face to the cell floor.  Due to Burkett's size and strength, two officers held down Burkett's legs, two officers held down Burkett's arms, and at least one officer pinned Burkett's torso against the cell floor.  Although the evidence is unclear as to whether it was ever used, one officer testified that he brought a blanket into the cell in order to protect against Burkett biting him.  Lieutenant Donovan testified that he remembers seeing the blanket used during the altercation, while another stated that he had asked Lieutenant Donovan prior to the encounter with Burkett if the blanket should be brought into Burkett's cell.  See, e.g., Doc. 78-4, Elliot Aff. at 30-31; Doc. 78-5 at 11; Doc. 78-7, Donovan Dep. at 46-47; Doc. 78-8 at 12.  Regardless, Burkett allegedly continued to resist the officers' efforts to restrain him until one of the officers used a stun gun on Burkett in an effort to subdue him. Doc. 78-9 at 24-25.  Although the level and types of force used by the officers in restraining Burkett varied, one officer admits using "knee strikes" to Burkett's right thigh aiming for the common peroneal nerve.  See Doc. 74-12 at 11.  Once restrained, the officers put Burkett into a "three-point restraint,"[2]  whereby

---

[2]A three-point restraint is a method used by law enforcement to restrict an individual's movement.  The police officer typically handcuffs an individual's hands and ankles, and then

they pinned Burkett on his stomach to the ground, and linked his handcuffs behind his back to his leg shackles. Doc. 78-1 at 4. Plaintiff alleges that the officers used abusive and unconstitutional force by punching, kicking, and striking Burkett during the confrontation. Id. At some point during the struggle, Burkett ceased to resist the officers. Once pinned, officers noticed that Burkett was not moving. Medical help was then called. Burkett was taken to a hospital, where he was later pronounced dead.

Various experts disagree as to the cause of Burkett's death. One of Defendants' experts claims "acute exhaustive mania" is the cause. Doc. 74-2 at 6. According to Defendants' postmortem examination, acute exhaustive mania occurs where schizophrenic patients experience "agitation, paranoid delusion, and combative behavior followed by cardiovascular collapse and death." Doc. 74-2 at 6. Evidently there was a history of schizophrenia in Burkett's family. Doc. 74-2 at 5; Doc. 78-16 at 2. Another expert, on the other hand, claims instead that Burkett's death resulted in part from "Diffuse Traumatic Axonal Injury," and in part from blunt trauma on Burkett's heart. Doc. 83-2 at 14.

On June 13, 2003, Burkett's mother, Deloris Burkett, filed the instant suit as personal representative of Burkett's estate as well as on her own behalf. Plaintiff's second amended complaint, Doc. 35, alleges the use of excessive force, and inadequate training against the municipal defendant, all claims under 42 U.S.C. § 1983, as well as a wrongful death claim under Florida law properly before this court. The individual officers have asserted the defense of qualified immunity, as well as a bevy of other affirmative defenses including contributory negligence, while Alachua County and Stephen Oelrich have argued that Plaintiff has failed to

---

links the two sets of handcuffs with a third set of handcuffs. Normally this procedure is undertaken with the individual laying face down.

meet the burdens required of a § 1983 plaintiff. After attempts at court-ordered mediation failed and an amended complaint was filed, a motion for summary judgment was filed with this court by all Defendants; a final decision on Defendants' motion was delayed to allow the completion of discovery. Now that discovery has been completed, Defendants' motion for summary judgment is ripe for consideration.

## II. STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) states that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material if it is a legal element of a claim that might affect the outcome of a case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248. Furthermore, an issue is to be considered "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In determining whether summary judgment is appropriate, the court must consider whether there is such disagreement that the fact-finding of a jury is required, or instead whether the facts as proven by either party dictate only one possible outcome to be achieved. See Anderson, 477 U.S. at 251-52. Of course, the moving party "always bears the initial burden of informing the district court of the basis for its motion . . . ." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When moving for summary judgment, the moving party must demonstrate the absence of any genuine issue to any material fact. Adickes v. S.H. Cress & Co., 398 U.S. 144, 157 (1970). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at

248.  Lastly, as noted above, the court must consider the moving party's motion and evidence in the light most favorable to the nonmoving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002) (The court must "view [ ] the record and draw [ ] all reasonable inferences in the light most favorable to the non-moving party.") .  Where reasonable minds may differ as to the inferences drawn from undisputed facts, the court must deny summary judgment.  See Hunt v. Cromartie, 526 U.S. 541, 553 (1999).

### III. DISCUSSION

A. Section 1983

42 U.S.C. § 1983 imposes liability upon any person who, when acting under color of state law, deprives another "of any rights, privileges, or immunities, secured by the Constitution and laws."  Arrington v. Cobb County, 139 F.3d 865, 872 (11th Cir. 1998).   Plaintiff must demonstrate a causal connection between a constitutional deprivation and the defendant's conduct.  Marsh v. Butler County, 268 F.3d 1014, 1059 (11th Cir. 2001) (en banc).

1. Individual Officers as Defendants

This court will first consider the claims against Defendant officers.  It is settled Eleventh Circuit law that "[i]n order to prevail in a §1983 civil rights action, the plaintiff must show a deprivation of a 'federal right by a person acting under color of state law.'"  Washington v. Bauer, 2005 WL 2114156, * 2 (11th Cir. 2005) (quoting Griffin v. City of Opa-Locka, 261 F.3d 1295, 1303 (11th Cir. 2001)).  In this case, Defendant officers were clearly acting under the color of state law.  All Defendants were performing their duties as law enforcement officers.  "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of state law.'" United States

v. Classic, 313 U.S. 325, 326 (1941).  Such misuse of power is the core question in this case, and therefore the § 1983 claims are properly before this court on the individual officers' liability.

  2. Stephen Oelrich, Alachua County Sheriff, in his Official Capacity

  In regards to Stephen Oelrich's liability in his official capacity under § 1983, a plaintiff must satisfy a two-prong test first laid out by the Supreme Court in Collins v. Harker Heights, 503 U.S. 115 (1992).  When suing the county sheriff in his official capacity, the plaintiff must allege and ultimately prove that: 1) the harm complained of was caused by the constitutional deprivation; and 2) the sheriff in his official capacity is responsible for that violation through either custom or policy. Id. at 120.

  Plaintiff has failed to make such a showing here.  Although theoretically the controller of policy at the county level, Alachua County Sheriff Stephen Oelrich has not been shown by plaintiff to have any responsibility for the allegations put forth in the Second Amended Complaint.  Specifically, Plaintiff alleges that Alachua County's policies ultimately resulted in the death of her son.  She fails, however, to provide any evidence of such policies.  Plaintiff asserts, for example, that "[t]he Alachua Sheriff's Office maliciously and sadistically uses tasters/stun guns as a matter of policy, practice, custom and procedure on mentally ill inmates." Doc. 78-1 at 5.  However, Plaintiff provides no proof of this policy beyond the abstract allegations of the instant case.  Therefore, in regards to the use of a taser and stun gun upon the deceased, Plaintiff has failed to substantiate the claim that the Alachua County Sheriff was responsible for the alleged violations of Burkett's constitutional rights.  Oelrich may not be held liable for the individual actions of his officers where he was not a causal factor in the alleged constitutional violation – respondeat superior or vicarious liability does not attach under § 1983.

City of Springfield v. Kibbe, 480 U.S. 257, 267 (1987) (O'Connor, J., dissenting) ("It is only when the 'execution of the government's policy or custom . . . inflicts the injury that the municipality may be held liable under § 1983") (citations omitted).  Plaintiff has alleged abuse, but aside from this alleged instance, has failed to provide evidence of policies endorsing such abuse.  Therefore, Plaintiff's § 1983 claim against Stephen Oelrich must fail.

    3. Alachua County

Section 1983 is intended to apply to municipalities and other such local governments as a way to ensure against the locally endorsed deprivation of constitutional rights.  See Monell v. Dep't of Social Servs., 436 U.S. 658, 690-91 (1978).  In Monell, the Supreme Court held that local governments can be "sued directly under § 1983 for monetary, declaratory, or injunctive relief" where constitutional deprivations result from the municipality's custom or policy.  Id. at 690-91; City of Ranchos Palos Verdes v. Abrams, 125 S.Ct. 1453, 1457-58, 161 L.Ed. 2d 316 (2005).[3]  Policy has been defined by courts in the Eleventh Circuit as "a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality."  Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997).  Custom, similarly, has been defined as "a practice that is so settled and permanent that it takes on the force of law."  Id.

Similar to the lack of substantive evidence in regards to Sheriff Oelrich's responsibility for the alleged constitutional deprivations, Plaintiff has failed to show evidence of county involvement in the death of Burkett.  Plaintiff states that "[a]s a policy, practice, custom or

---

[3] Monell clearly requires the showing of such a custom or policy on the part of the local government - "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."  Monell, 436 U.S. at 694.

procedure, the Alachua County Sheriff's Office regularly engages in the use of blankets and or other fabrics over and about the face, mouth and breathing orifices of inmates to subdue them." Doc. 78-1 at 3.  Absent evidentiary proof of such policies, however, Plaintiff's unsubstantiated claims must fail.  Plaintiff fails to provide proof of such customs or policies here.  Plaintiff indicates that depositions of Defendants allegedly support the finding of "policy."  Each instance cited, however, merely indicates that a blanket was brought into Burkett's cell on this specific occasion; nowhere do Defendants indicate that it is the policy of the Sheriff's office to regularly do so.  See, e.g., 78-4, Elliot Dep. at 30-31, 41-42 (indicating blanket was brought into Burkett's cell, but failing to identify a policy of such behavior); Doc. 78-7, Donovan Dep. at 19, 53-54 (indicating that a blanket may have been used in this instance, but failing to indicate a policy of such behavior).  Although Lieutenant Donovan admitted in a deposition that blankets are sometimes used on the side of the head of an inmate, such evidence fails to prove Plaintiff's allegation that the Alachua County Jail uses such devices to block breathing orifices.

    Burkett's death is undeniably tragic; however, this court may not assume that simply because Burkett died in jail, there must be a policy to blame.  In failing to identify a policy or custom, Plaintiff may not pursue an alleged violation of § 1983 against Alachua County.  Therefore, summary judgment is appropriate for defendant Alachua County.

B. Fourth Amendment Principles

    In considering Plaintiff's claims against the individual officers, the court must first determine  whether "the plaintiff has alleged the deprivation of an actual constitutional right at all."  Conn v. Gabbert, 526 U.S. 286, 290 (1999).  In order to do so, this court must identify a specific constitutional right allegedly infringed since, standing alone, § 1983 does not provide

substantive rights, but instead serves merely as a gateway for recovery.  Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979).  As such, an excessive force claim must be analyzed under the Fourth Amendment of the United States Constitution and its relevant standard of reasonableness.  Brousseau v. Haugen, 543 U.S. 194 (2004).  The Eleventh Circuit has provided a framework for consideration of such a violation, stating:

> In order to determine whether the amount of force used by a police officer was proper, a court must ask 'whether a reasonable officer would believe that this level of force is necessary in the situation at hand.' The Supreme Court has held that 'determining whether the force used to effect a particular seizure is 'reasonable under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake.

Lee v. Ferraro, 284 F.3d 1188, 1197-98 (11th Cir. 2002); see also Crosby v. Paulk, 187 F.3d 1339, 1351 (11th Cir. 1999) (defining "objective reasonableness").

Even if the court finds that a constitutional violation may have occurred, Plaintiff may still be barred from recovery if the Defendants are entitled to qualified immunity.  Plaintiff can "only state a claim under [the] Fourth Amendment . . . if the officers are not entitled to qualified immunity."  Mercado v. City of Orlando, 407 F.3d 1152, 1156 (11th Cir. 2005).  The doctrine of qualified immunity is intended to protect "government officials performing discretionary functions from civil trials . . . and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known."  Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (internal citations omitted).  However, the court need not address the issue of qualified immunity in this case, as the evidence fails to indicate that a constitutional violation has occurred.

Although on summary judgment the facts must be viewed in the light most favorable to

the nonmoving party, the court must make its determination based on the perspective of the officer.  Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004); Garrett v. Athens-Clarke County, 378 F.3d 1274, 1279 (11th Cir. 2004).   As each individual officer herein was involved in the final incident culminating in Burkett's death, the court will collectively analyze the claims against them.

In this case, the court finds that "reasonable officer[s] could have believed that the force applied was reasonably necessary" given the circumstances the officers found themselves in. Crosby v. Monroe County, 394 F.3d 1328, 1334 (11th Cir. 2004).  When officers first arrived to Burkett's home, they did so for the reason of transporting Burkett to Meridian, a mental health care facility.  Upon their arrival, Burkett forcibly resisted the officers' attempts to transport him, severely injuring an officer in the process.  Once Burkett arrived at the jail, it was apparent that he remained unhappy with his position.  In fact, Defendants provide the only evidence in this regard, stating that Burkett was loud and aggressive in the hours immediately subsequent to his arrest and booking.  See, e.g., Doc. 74-1 at 4-5 (citing Defendants' depositions).

Lieutenant Donovan stated that all the officers were on notice of Burkett's mental state. Doc 78-7, Donovan Dep. at 33-35.  Given this knowledge, it is reasonable to assume that the officers needed to find a way to quickly protect themselves when Burkett allegedly charged the officers and nurse in a threatening manner when the officers entered Burkett's cell to administer the court-ordered blood test.  Doc. 78-7, Donovan Dep. at 42-43.  Multiple officers–as many as six–were needed to subdue Burkett.  These officers proceeded to pin Burkett down to the ground.  To the court, a reasonable officer could have viewed this level of force as necessary given the circumstances.  Additionally, a blanket may have been used to protect the officers from

Burkett, which again appears like a reasonable move given the fact that Burkett had previously bitten one officer and attempted to bite another.  See supra p. 2.  Furthermore, while Defendants elected to shoot Burkett with a stun gun in order to subdue him, the Supreme Court has held that use of a taser or stun gun is permissible so long as it is used in "a good faith effort to maintain or restore discipline [and not] maliciously and sadistically for the very purpose of causing harm," Whitley v. Albers, 475 U.S. 312, 320-21 (1986).  There is no evidence of a malicious or sadistic purpose for the use of the taser gun in this case.  Prior to using this weapon on Burkett, the officers unsuccessfully attempted to restrain him using ordinary physical means.  Therefore, given Burkett's size and disposition at the time, a reasonable officer could have believed that this level of force was necessary.  Thus, despite the tragic result, the court finds that the Defendants' actions were reasonable in light of the circumstances.

     Implicit support for this holding can be found in Crosby v. Monroe County, 394 F.3d 1328 (11th Cir. 2004).  In Crosby, the Eleventh Circuit affirmed a district court's granting of summary judgment to an officer who had placed his foot on the side of a suspect's neck in order to restrain the suspect.  Id. at 1334-35.  The court held that the officer was justified in taking such action in order to prevent the suspect from reacting violently.  Here, Burkett had already exhibited violent outbursts in which multiple officers were injured.  The officers took the steps which they felt at the time were necessary to protect themselves from any further outbursts.  While in hindsight some may suggest alternative courses of action which may have helped prevent this tragic event, the officers involved were required to improvise and make quick judgment calls on what to do in order to adequately protect themselves from Burkett.  Id. at 1334 ("We must see the situation through the eyes of the officer on the scene who is hampered by

incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal.").  Accordingly, summary judgment is appropriate for Defendants Warren, Hudson, Elliot, Reed, Tetstone, Fellows, Steen, and Donovan.

C. State Law Claims for Wrongful Death

Plaintiff has also brought a claim for wrongful death under the Florida Wrongful Death Act.  Doc. 7 at 24.  All Defendants move for summary judgment.   In their motion, Defendants state that "because the use of force under the circumstances was reasonable and privileged, all claims can be resolved" under summary judgment.  Doc. 74-1 at 14.  In order for Defendants' acts to be "objectively reasonable," as is required for summary judgment, the officers' actions must be considered in light of the totality of the circumstances.  See Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998) (judgment based on totality of circumstances).  Considering the evidence in such a light, and for the reasons discussed above, the court hereby finds that summary judgment is appropriate for Defendant officers.  Therefore, the court grants the individual defendants' motion for summary judgment on the state wrongful death claim. Accordingly, it is hereby:

    **ORDERED AND ADJUDGED:**

    1.    Defendants' Motion for Summary Judgment, Doc. 74, is granted.

    2.    Defendants' Motion to Bifurcate, Doc. 86, is denied as moot.

    3.    The Clerk is directed to enter judgment for the Defendants and to close this case.

**DONE AND ORDERED** this <u>27th</u> day of July, 2006.

<u>*s/Maurice M. Paul*</u>
Maurice M. Paul, Senior District Judge
